J-A26015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| | |
| JOHNNIE LENAN NELSON | |
| Appellant | No. 2104 MDA 2016 |

Appeal from the Judgment of Sentence July 21, 2016
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0005539-2013

BEFORE:  BOWES, OLSON, AND RANSOM, JJ.

MEMORANDUM BY BOWES, J.:  **FILED FEBRUARY 13, 2018**

Johnnie Lenan Nelson appeals from the judgment of sentence of life imprisonment, imposed following his convictions for first-degree murder, conspiracy to commit murder, and possessing an instrument of crime.  We affirm.

> During the late evening hours of July 4, 2013, Darryl Jones was shot and killed in an alleyway between the 1100 block of North 12th Street and Birch Street in the City of Reading.
>
>      . . . .
>
> [T]he Commonwealth presented evidence from multiple sources: . . . [including] the Commonwealth's key witness, co-defendant Eric Harding (aka Fat Boy, Nut), who testified at length and in detail about the events which occurred on the evening of July 4, 2013 into July 5, 2013.
>
> Harding testified about meeting the defendant in the area of North 12th Street on the afternoon of July 4, 2013 to ride four

wheelers and to attend a 4th of July party at 1027 North 12th Street. The two split up while riding the four-wheelers; the defendant returned after dark and told Harding that he was going to watch fireworks. Harding left the area to unload the bikes and spend time with his children. At around 11:00 p.m., Harding returned to N. 12th Street with a friend, Zechariah (Zach), and parked on Robeson Street. They met up with the defendant at the party.

At around 11:20 p.m., Darryl Jones (aka "Sparks") arrived at the party. Jones approached a group on the sidewalk and shook hands with Harding, the defendant and a third individual. Defendant and Jones engaged in friendly conversation. Harding walked down the street to the corner of N. 12th and Robeson Streets to avoid another individual who arrived at the party. When he reached the corner, he turned around and saw Jones, followed by the defendant, walking towards him. Ms. Kadijatu Conteh also saw the defendant and Jones leave the party together. Jones told Harding to "[s]tay right here. I'll be right back". Defendant arrived, laughing, and told Harding, "I'll be right back and just be ready to go".

Defendant followed Jones up towards an alleyway, then they turned and entered the alleyway. Harding did not enter the alleyway. Harding did not know what Defendant was going to do in the alleyway. He assumed that Defendant was going to do something to Jones in the alleyway, maybe beat him up, and leave. Harding started his truck, pulled up to the alleyway but couldn't see them, then began circling the block. As he was circling for the third time, he heard three gunshots that sounded very close. He braked, looked around, then started driving. As he approached an alleyway/breezeway between two houses on 12th Street, Defendant emerged, running out with a black firearm in his hand. . . .

. . . .

[T]he defendant told Harding what happened in the alleyway. He told Harding that Jones turned toward him in an aggressive manner, with his hand in his pocket. He thought Jones had a gun and convinced Jones to keep walking. Once they got in the alleyway, he shot him in the back of the head, then shot him twice more, then took off running. As Harding and the

defendant traveled down 5th Street towards Muhlenberg Township, the defendant, while still wearing gloves, removed pieces of the disassembled gun from the Ziploc bag and threw them out the widow of the car as the car was moving. The pair then went to the West Reading Diner to get something to eat.

Darryl Jones's body was discovered in the alleyway at approximately 4 a.m. on July 5, 2013 by Officer Sholedice. . . . [who] began looking for evidence. Further north in the alley, he discovered an open wallet with a PA ID card. [T]he wallet [contained] a PA Identification card for the defendant, along with other cards (SS, student ID, Metro Bank card) with the defendant's name.

Trial Court Opinion, 3/17/17, at 1-7 (citations to transcript omitted).

Following his conviction, Appellant filed a timely post-sentence motion, which was denied. He filed a timely notice of appeal and complied with the order to file a concise statement. The Honorable Patrick T. Barrett authored a thorough and cogent thirty-eight page opinion responding to Appellant's points of error. He raises the following claims on appeal:

A. Whether the trial court erred in denying defendant's pretrial motion for discovery, which requested that the Commonwealth provide all recorded telephone calls made by Eric Harding while incarcerated at the Lancaster County prison because the records custodian for those records refused to honor a defense subpoena for those records and the court did not order the Commonwealth to obtain those records and turn them over in discovery even though the Commonwealth obtained and provided the defense with all recorded telephone calls made by Eric Harding while incarcerated at the Berks County prison?

B. Whether the trial court erred when it permitted the Commonwealth to introduce recorded telephone calls made by defendant while he was incarcerated in Berks County jail because the content of the phone calls and the trial testimony of the co-defendant about his interpretation of the meaning of

those phone calls was unfairly prejudicial and denied defendant a fair trial as they referred to prior bad acts and "gangs"?

C. Whether the trial court erred when it permitted the Commonwealth to introduce a surveillance video from the West Reading diner that allegedly depicted defendant and co-defendant, Eric Harding because it was not relevant and was too remote in time to the alleged crimes, which was unfairly prejudicial and denied defendant a fair trial?

D. Whether the trial court erred when it permitted the Commonwealth to introduce recorded DVD interview of Commonwealth witness William Rosario because he testified he had no recollection of the content of his earlier interview because it was unfairly prejudicial, denied defendant his right to confront the witness, and denied defendant a fair trial?

E. Whether the trial court erred when it refused to allow defense counsel to fully cross examine Eric Harding, with the information attached to the trial transcript as Defense Exhibit 4, about his involvement as a participant/witness in a murder case in [New Jersey], which denied defendant his right to confront the witness and denied defendant a fair trial?

F. Whether the trial court erred in failing to grant defendant a new trial because juror number 12 was a juror on the case and had an undisclosed, close familial relationship with the victim, Darryl Jones Jr. and was unable to be fair and impartial as a juror thus denying defendant due process and a fair trial as required by Article I, § 9 of the Pennsylvania Constitution and the 6th Amendment to the United States Constitution?

G. Whether the trial court erred in failing to grant defendant a judgment of acquittal or an arrest of judgment on all charges because the verdicts of the jury were against the weight of the credible evidence presented at trial for all the reasons set forth in defendant's post sentence motions?

H. Whether the trial court erred in failing to grant defendant a new trial based upon the newly discovered evidence of the testimony of John Rushton, which could not have been discovered prior to trial through the exercise of due diligence, was not merely corroborative or cumulative, would not be used

solely to impeach a witness' credibility and would likely result in a different verdict had that testimony been presented to the jury at trial?

Appellant's brief at 2-4.

We have carefully reviewed the record, the parties' briefs, and the trial court opinion, and find that the Pa.R.A.P. 1925(a) opinion aptly disposes of issues two, three, five, six, seven, and eight.  We therefore adopt its reasoning as our own with respect to those issues.  **See** Trial Court Opinion, 3/17/17, at 11-13 (issue two); **id**. at 13-14 (issue three); **id**. at 16-18 (issue five); **id**. at 19-25 (issue six); **id**. at 26-29 (issue seven); **id**. at 29-38 (issue eight).  We write separately to address claims one and four.

**Issue #1 – Motion for discretionary discovery**

Appellant's first issue concerns his attempts to obtain recordings of phone calls placed by co-defendant Eric Harding while Harding was incarcerated at the Lancaster County Jail.  Specifically, Appellant challenges the court's refusal to order the discovery under the discretionary provisions of Pa.R.Crim.P. 573, which reads in pertinent part:

**(B) Disclosure by the Commonwealth.**

. . . .

(2) *Discretionary With the Court.*

(a) [I]f the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect and copy or photograph any of the following requested items, upon a showing that they are material to the

- 5 -

preparation of the defense, and that the request is reasonable:

(i) the names and addresses of eyewitnesses;

(ii) all written or recorded statements, and substantially verbatim oral statements, of eyewitnesses the Commonwealth intends to call at trial;

(iii) all written and recorded statements, and substantially verbatim oral statements, made by co-defendants, and by co-conspirators or accomplices, whether such individuals have been charged or not; and

(iv) any other evidence specifically identified by the defendant, provided the defendant can additionally establish that its disclosure would be in the interests of justice.

Pa.R.Crim.P. 573.

Instantly, we note that this prosecution did not occur in Lancaster County. Harding was incarcerated in Berks County for an unspecified period of time and was later transferred to the Lancaster County jail. Appellant successfully obtained copies of all recordings made during Harding's stay in Berks County, as the Commonwealth apparently obtained those materials and supplied them to Appellant.

The Commonwealth did not possess any of the jail recordings from Harding's stay at Lancaster County Jail. On June 23, 2015, Appellant filed a motion for discovery, seeking, *inter alia*, those items. Appellant represented

in his motion that he had served a subpoena upon the records custodian for the Lancaster County Jail, who refused to honor the document and instead told Appellant that he had to file a discovery request with the Berks County District Attorney's Office. Thus, Appellant requested that the Commonwealth both obtain and provide the materials.

The trial court thereafter scheduled a hearing on the discovery request and ordered the Commonwealth to "obtain copies of all Lancaster County Prison call logs pertaining to Eric Harding and to produce them to Defense Counsel on or before the hearing scheduled in this case on September 1, 2015." Order, 8/24/15, at 1. At that hearing, the Commonwealth stated that it had complied and produced the logs, which indicated that "there are 584 calls, approximately 15 minutes apiece. There are 557 calls to the phone number of his wife." N.T. Discovery Hearing, 9/1/15, at 14. The Commonwealth also added that Appellant made no showing that the calls contained any relevant information. Harding's counsel was also present and opposed the request, expressing fear for Harding's safety due to his status as a cooperating witness, as the calls "could disclose to the defense information as to my client's family's whereabouts, which the Commonwealth and myself have gone to lengths to try to make sure that the [d]efendant does not have access to." *Id*. at 16. The trial court took the matter under advisement and ordered the parties to file briefs.

Notably, the Commonwealth's response confirmed that the Berks County District Attorney's Office never obtained the calls: "The Commonwealth does not have the Lancaster County phone calls in its possession nor does the Reading Police Department have the calls." Commonwealth's Response, 10/15/15, at unnumbered 4.

The trial judge[1] denied the motion, and simultaneously issued an opinion supporting the order. As the opinion aptly explains, a defendant has the burden of proving that (1) the request for the recorded phone calls was material to the preparation of his defense; (2) the request was reasonable; and (3) the information would be in the interests of justice. **See Commonwealth v. Garcia**, 72 A.3d 681, 684 (Pa.Super. 2013). The judge determined that Appellant failed to establish these prerequisites, as he merely asserted that the tapes might possibly be useful. Opinion, 12/18/15, at 2.

We agree with that analysis. Putting aside the fact that the Commonwealth did not actually possess the information in question, a point discussed *infra*, we find no abuse of discretion in the trial court's

_____

[1] The Honorable Paul Yatron was originally assigned to this case, and decided, *inter alia*, the discovery motion. Judge Yatron later recused himself, and the matter was assigned to Judge Barrett. Judge Yatron issued a separate order/opinion explaining his reasons for denying the pre-trial motion.

determination. There was no showing of materiality and the request for the recordings cannot be viewed as reasonable in light of the volume of calls requested.

We write separately to address Appellant's alternative argument: "In the alternative, the trial court erred by refusing to order the Commonwealth to produce all of the recorded phone calls requested in defendant's motion for discovery pursuant to its obligations under *Brady v. Maryland*[, 373 U.S. 83 (1963)]". Appellant's brief at 14.

This argument is misplaced. *Brady* obligations speak to what the prosecution is required to do from a constitutional standpoint, rather than what must be supplied under the discretionary provisions of Rule 573. "In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Commonwealth v. Burke*, 781 A.2d 1136, 1141 (Pa. 2001) (quotation marks omitted).

In this regard, Appellant fails to recognize that the Berks County District Attorney's Office was never in possession of the Lancaster County

recordings.[2] While it is clear that a prosecutor's *Brady* obligations extend beyond what the prosecuting agency physically has in its files, we conclude that *Brady* does not extend to materials possessed by a governmental agency not involved in a defendant's prosecution. As our Supreme Court explained in *Commonwealth v. Weiss*, 81 A.3d 767 (Pa. 2013), a prosecutor has the duty under *Brady*

> to learn of all evidence that is favorable to the accused which is known by others acting on the government's behalf in the case, including the police. *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Pursuant to *Kyles,* "the prosecutor's *Brady* obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution." *Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136, 1142 (2001). Moreover, there is no *Brady* violation when the defense has equal access to the allegedly withheld evidence. *See Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1248 (2006) ("It is well

---

[2] Relatedly, both trial court opinions have assumed that the discretionary powers under Pa.R.Crim.P. 573(B)(2) encompass the ability to force the Commonwealth to obtain information it does not already possess on the defendant's behalf. That is a highly questionable notion. *See Commonwealth v. Bridge*, 435 A.2d 151, 157 (Pa. 1981) ("[W]e are not aware of an affirmative obligation on the part of the Commonwealth to search for evidence that might be supportive of a defense for the accused."); *Mills v. Singletary*, 63 F.3d 999, 1019 (11th Cir. 1995) ("The jail records, on the other hand, were available on demand by either counsel."); *Commonwealth v. Ribot*, 169 A.3d 64, 69 (Pa.Super. 2017) ("The Commonwealth does not violate mandatory disclosure rules by failing to produce evidence that it reasonably does not possess.") (citation omitted). While these citations are discussing mandatory disclosure, whereas the instant litigation addresses discretionary disclosure, it is difficult to conceive that a trial court can commit an abuse of discretion by failing to order the Commonwealth to do that which it has no constitutional or rule-based obligation to do.

established that no **Brady** violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." (internal citation omitted)).

***Id***. at 783.

Thus, **Brady** would apply only if the county correctional facility stands on the same footing as a police agency for purposes of "acting on the government's behalf" as contemplated by **Kyles**. No Pennsylvania precedent appears to directly answer this question; however, other jurisdictions have expressed the view that material gathered by a correctional facility does not qualify as a "law enforcement agency" when the facility itself is not involved in the prosecution.[3] **People v. Lewis**, 125 A.D.3d 1109, 1111 (N.Y. App.Div. 2015) ("Evidence gathered by prison staff, however, generally is not under the control or in the possession of the People or its agents, but was instead in the possession of an administrative agency that was not performing law enforcement functions") (quotation marks and citation omitted); **United States v. Whitehead**, 165 F.Supp.3d 281, 283 (E.D. Pa. 2016) (government not required to review co-defendant's Bureau of Prisoner materials; "Nor does **Brady** require prosecutors to search records of other agencies, even if prosecutors could easily acquire those records for their own purposes.").

---

[3] The relationship would change if the Commonwealth was prosecuting, for example, an inmate for attacking a correctional officer.

Additionally, our Supreme Court has stated that "the prosecutorial duty respecting exculpatory evidence in the files of police agencies is limited to those agencies of the same government bringing the prosecution; Commonwealth prosecutors are not responsible to secure and disclose information held by federal authorities." *Commonwealth v. Watkins*, 108 A.3d 692, 711–12 (Pa. 2014) (citation omitted). Herein, the government agency is a further step removed by virtue of the fact it is located outside the jurisdiction of the prosecuting agency.

Finally, Appellant does not explain why he did not simply seek enforcement of the subpoena served upon the Lawrence County records custodian. Therefore, we find no merit to Appellant's alternative argument.

**Issue #4 – Introduction of Prior Recorded Recollection**

The third issue pertains to the admission of a video recording of Commonwealth witness William Rosario, which was played to the jury. The trial court permitted the Commonwealth to play the video pursuant to Rule of Evidence 803.1(3), which states in pertinent part:

> **(3) Recorded Recollection of Declarant-Witness.** A memorandum or record made or adopted by a declarant-witness that:
>
> (A) is on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately;
>
> (B) was made or adopted by the declarant-witness when the matter was fresh in his or her memory; and

(C) the declarant-witness testifies accurately reflects his or her knowledge at the time when made.

Pa.R.E. 803.1.

Appellant avers that the trial court abused its discretion in permitting the Commonwealth to play the video, and argues that a new trial is required because he could not cross-examine the witness.

Our review of a trial court's evidentiary rulings applies the following standard.

> The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Mickel*, 142 A.3d 870, 874 (Pa.Super. 2016).

We find that the trial court abused its discretion in admitting the video. However, we find that Appellant is not entitled to relief, as the basis for his argument is that his Confrontation Clause rights were violated, and we deem harmless any error in that regard due to the fact Mr. Rosario was actually subject to cross-examination regarding the statement.

The Commonwealth's direct examination of Mr. Rosario began with questions regarding Mr. Rosario's incarceration, and the fact his attorney contacted the Commonwealth regarding his offer to supply information in exchange for favorable treatment on Mr. Rosario's pending case. Having

established this background, the Commonwealth immediately transitioned to asking questions about his recorded statement:

> Q.  When you came into the District Attorney's November 3rd or 4th of 2013, this was at City Hall in the City of Reading, Berks County, do you remember whether that was recorded by –
>
> A.  I'm not even sure.
>
> Q.  No? Okay.  Did you give a statement?
>
> A.  I believe so, I did.
>
> Q.  Were you trying to be truthful when you made that statement?
>
> A.  Yes, sir.
>
> Q.  Did it pertain to a matter that you reached out to the District Attorney's Office about the death of Darryl Jones on July 4th?
>
> A.  I believe so.
>
> Q.  Okay.  When you gave that statement, was the information that you gave to the Reading Police Department, was that fresh in your memory when you gave it to them?
>
> A.  Can you repeat that again?
>
> Q.  Was the information that you gave to the police, was that information that you remember was fresh in your memory?
>
> A.  At that time.
>
> Q.  At that time, right.  And did you tell the police that you were giving them the truthful statement?
>
> A.  Yeah.
>
> Q.  Do you remember right now, this is almost two and a half years later, do you remember the contents of that statement now?

A. No, no, it had been so long.

N.T., 5/23-27/16, at 312-15.

The Commonwealth then asked questions about what Mr. Rosario received in exchange for his cooperation. At that juncture, Appellant moved for a sidebar, having been informed by the prosecutor that the Commonwealth intended to introduce the actual video recording of Mr. Rosario's statement. The trial court heard argument in chambers.

> [COMMONWEALTH]: I would argue that it's a hearsay exception 803.1(3). It's not refresh the memory. It's recorded recollection, 803.13.
>
>     . . . .
>
> This is a very specific . . . hearsay rule hearsay exception, recorded recollection. And this is not me trying to refresh his memory. This is me playing the video as substantive evidence and this allows under the Rule 803.1(3).

*Id* at 320-21. The Commonwealth insisted that it met all the requirements of Rule 803.1(3), and claimed that the point of recording such statements was to allow the Commonwealth to play entire tapes at trial:

> [COMMONWEALTH]: If we cannot use videotape statements from witnesses in cases through recorded recollection to this hearsay exception, then they're wasting a lot of time over there, because they spent a lot of money installing that system, for what? For this particular instance, recorded recollection, that's exactly why they installed that system. It is allowed. I satisfied all of the elements of this exception.
>
>     . . . .

This is the exact reason why we make videotape interviews, because even if we did written statements –

THE COURT: Are you saying you've done this before in common pleas court here?

[COMMONWEALTH]: I have never done it, because it never comes up in my particular cases. But that's the reason why the Reading City Police installed the recording system. . . . You can look at the rule yourself[.]"

*Id*. at 323-25.

We have examined the Rule and find the Commonwealth's argument lacking. We find that the court abused its discretion, as we do not think that the Rules of Evidence sanction eliminating in-court testimony in favor of videotaped statements that were not made under oath.[4]

Starting with the text of the Rule, we find that the Commonwealth and trial court have overlooked a distinction between memory of the **statement** versus memory of the **events**. The Rule states that the Commonwealth, as proponent of this evidence, must establish that the recording "is on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately[.]" The Commonwealth relies on Mr. Rosario's negative answer to the question, "Do you remember right now, this is almost two and a half years later, do you remember the contents of that

---

[4] As Appellant correctly argued to the trial court, the danger of playing a videotaped statement in its entirety is that the jury hears statements not made under oath, where the police control the questioning, and defense has no opportunity to interject, object, or cross-examine.

statement now?" as satisfying this requirement. However, it is unsurprising that the witness agreed that he could not particularly recall the contents of his statement. Nor does the Rule address an inability to recall the statement. Instead, the Rule speaks to whether the witness can recall the matter. The Rule contemplates that the questioner will ask the witness about the actual events at issue prior to any invocation of this exception; for instance, the Commonwealth could have asked, "Do you recall speaking to the defendant while you were incarcerated?" This is in line with our judicial system's basic philosophy of presenting testimony in open court, where the jury is directed to pay attention to things such as a witness's demeanor, attitude, and behavior in determining credibility. It hardly serves those purposes to present a video of a prior statement, as if the jury's role is to watch a movie and give a review of an actor's performance.

Continuing our analysis of the Rule's text, the Commonwealth fails to address the fact that the Rule states within the body of the exception: "If admitted, the memorandum or record may be read into evidence and received as an exhibit, **but may be shown to the jury only in exceptional circumstances** or when offered by an adverse party." Pa.R.E. 803.1(3) (emphasis added). Herein, the Commonwealth directly proceeded to show the jury the video recording, which is *per se* improper. The Commonwealth presented no exceptional circumstances beyond its desire to have the jury hear and see the video. *See Commonwealth v. Patterson*,

91 A.3d 55 (Pa. 2014) ("[T]he trial court did not preclude the defense from attempting to refresh the witness's recollection with the videotape; rather, it prohibited the playing of the tape in front of the jury, which is consistent with Rule 803.1.").

The foregoing analysis is in line with the body of case law interpreting this Rule. The Comment to Rule 803.1 states that it is consistent with prior law, citing **Commonwealth v. Cargo**, 444 A.2d 639 (Pa. 1982). **Cargo** involved a Commonwealth witness who testified that he did not remember the murder at issue or being interviewed by the police. The prosecutor then introduced his prior recorded statement. **Cargo** set forth the prerequisites for introducing the statements, including, as pertinent herein, that "the witness must lack a present recollection of the event[.]" **Id**. at 641 (citation omitted).

> Pennsylvania case law requires only that the proponent of the prior statement present evidence of the witness's lack of present recollection. **Such evidence may be presented by attempting to refresh the witness's recollection, after an initial failure of memory, by use of the prior statement**. If the witness then testifies that he still has no present recollection of the relevant events, the third requirement . . . has been satisfied.
>
> The Commonwealth followed the procedure outlined above in the instant matter. The witness testified initially that he had no present recollection of the event, a contention he repeated at least three times during his testimony. Whether or not this lack of present memory was genuine, it was obvious that the witness would not testify from present memory.

*Id*. at 643–44 (footnotes omitted, emphasis added). As indicated, the law requires that the Commonwealth demonstrate that the witness actually lacked memory of the events, typically accomplished by refreshing the witness's memory with the document itself. *See also Commonwealth v. Young*, 748 A.2d 166, 177 (Pa. 1999) (statement admissible as past recollection recorded; witness "had no present recollection of the events, even after seeing the statement"). The Commonwealth did not ask Mr. Rosario one question regarding the topics explored on the video recorded statement, and instead proceeded directly to introducing the tape. Due to the foregoing analysis, we find that the trial court abused its discretion in displaying the video to the jury.

Having established that the court erred in admitting the evidence, the question is whether Appellant is entitled to a new trial. As our Supreme Court explained in *Commonwealth v. Robinson*, 721 A.2d 344 (Pa 1998):

> [O]nce it is determined that the trial court erred in admitting the evidence, the inquiry becomes whether the appellate court is convinced beyond a reasonable doubt that such error was harmless. Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id*. at 350 (citations omitted).

We find that the first of these possibilities applies herein, as Appellant's sole argument that he was prejudiced is that he was "denied the . . . right to properly confront and cross[-]examine William Rosario, a witness against him at trial."  Appellant's brief at 26.

In *Crawford v. Washington*, 541 U.S. 36, 51 (2004) the United States Supreme Court held that the Sixth Amendment bars the introduction of testimonial hearsay statements unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.  There is no doubt that the instant statement, which the prosecutor admitted was recorded precisely for the possibility of later use at trial, qualifies as a testimonial statement.  "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard."  *Id*. at 53.

However, Appellant's reference to his Confrontation Clause rights fails to account for the fact that Mr. Rosario was, in fact, subject to cross-examination at trial.  *Crawford* is concerned with introducing the testimony of an **unavailable** witness with no opportunity for cross-examination.  Obviously, Appellant had no prior opportunity to cross-examine Mr. Rosario with respect to what he told the authorities during the videotaped interview.  However, while introduction of the tape violated his Confrontation Clause rights with respect to his inability to cross-examine a tape, he was able to fully cross-examine Mr. Rosario at trial.  *See Commonwealth v. Atkinson*,

987 A.2d 743 (Pa.Super. 2009) (use of two-way video system violated defendant's Confrontation Clause rights, but error was harmless).   Mr. Rosario was present in the courtroom and Appellant had a full opportunity to cross-examine him regarding everything that he told the police in the prior statement, and he actually did so.   Appellant does not claim that the tape contained any irrelevant or prejudicial comments that would not have otherwise been admissible.[5]   Therefore, he was not prejudiced by the introduction of the videotape and no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/13/2018

---

[5]  We note that the jury trial transcript does not contain a transcription of the videotaped statement.  As noted, Appellant's argument is limited to a contention that his Confrontation Clause rights were violated.

COMMONWEALTH OF        : IN THE COURT OF COMMON PLEAS
PENNSYLVANIA           : OF BERKS COUNTY, PENNSYLVANIA
                       : CRIMINAL DIVISION
v.                     :
                       : NO. CP-06-CR-0005539-2013
JOHNNIE NELSON         :
DEFENDANT              : PATRICK T. BARRETT, JUDGE

Colin Boyer, Esq., for the Commonwealth at Trial
Alisa Hobart, Esquire, for Commonwealth on Appeal
Michael D. Dautrich, Esq., for Defendant

$PTB, J.$

RULE 1925(a) OPINION        BARRETT, J.              March 17, 2017

Defendant Johnnie Nelson, by and through counsel, appeals from the judgment of

sentence entered on July 21, 2016, made final by the denial of his post-sentence motion

on November 23, 2016. Pursuant to Pa.R.A.P. 1925(a), we submit the following Opinion.


I.      BACKGROUND AND PROCEDURAL HISTORY

During the late evening hours of July 4, 2013, Darryl Jones was shot and killed in an

alleyway between the 1100 block of North 12th Street and Birch Street in the City of

Reading. On August 29, 2013, the defendant was charged by criminal complaint with

multiple offenses arising out of the shooting death of Darryl Jones: murder of the first

degree;[1] conspiracy to commit murder of the first degree;[2] murder of the third degree;

[3] conspiracy to commit murder of the third degree;[4] 2 counts of aggravated assault;[5] 2

---

[1] 18 Pa.C.S.A.§ 2502(a)
[2] 18 Pa.C.S.A.§ 903(a)(1) and   18 Pa.C.S.A.§ 2502(a)
[3] 18 Pa.C.S.A.§ 2502(c)
[4] 18 Pa.C.S.A.§ 903(a)(1) and   18 Pa.C.S.A.§ 2502(c)
[5] 18 Pa.C.S.A.§ 2702(a)(1) and 18 Pa.C.S.A.§ 2702(a)(4)

BERKS COUNTY, PA

2017 MAR 17 PM 1:19

CLERK OF COURTS

counts of conspiracy to commit aggravated assault; [6] persons not to possess, use, manufacture, control, *etc.* a firearm; [7] firearms not to be carried without a license; [8] possessing instrument of crime; [9] simple assault; [10] and conspiracy to commit simple assault. [11] On May 27, 2016, a jury convicted the defendant of murder of the first degree, conspiracy to commit murder of the first degree,[12] 2 counts of aggravated assault, 2 counts of conspiracy to commit aggravated assault, possessing an instrument of crime.[13] The 2 remaining firearms charges were severed prior to trial.

On July 21, 2016, this court sentenced the defendant to life imprisonment on count 1 - murder of the first degree, 10 to 20 years on count 2 -conspiracy to commit murder of the first degree, to be served consecutively to the sentence imposed on counts 1, 2 to 5 years on count 11 – possessing an instrument of crime, to be served concurrently to the sentence imposed at count 1. Counts 9 and 10, the previously-severed firearms charges, were withdrawn at sentencing. The remaining counts on which the defendant was found guilty (aggravated assault, conspiracy to commit aggravated assault) merged for sentencing purposes.

---

[6] 18 Pa.C.S.A. § 903(a)(1) and  18 Pa.C.S.A.§ 2702(a)(1), 18 Pa.C.S.A.§ 2702(a)(4)
[7] 18 Pa.C.S.A. § 6105(a)(1)
[8] 18 Pa.C.S.A. § 6106(a)(1)
[9] 18 Pa.C.S.A. § 907(a)
[10] 18 Pa.C.S.A. § 2701(a)(1)
[11] 18 Pa.C.S.A. § 903(a)(1) and  18 Pa.C.S.A.§ 2701(a)(1)
[12] The jury was charged with the lesser included offense of voluntary manslaughter. However, having reached a guilty verdict as to the first degree murder count, it did not reach the third degree murder count or voluntary manslaughter.
[13] The Commonwealth withdrew the counts of simple assault and conspiracy to commit simple assault prior to sending the case to the jury.

Defendant, through trial counsel, filed a timely motion for post sentence relief seeking judgment of acquittal, arrest of judgment, and a new trial on August 1, 2016.[14] Following an evidentiary hearing, and consideration of the record of that hearing and the parties' various supplemental motions, responses and legal argument, this court denied the defendant's various post-sentence and discovery motions by order dated November 23, 2016 and docketed November 28, 2016. On December 22, 2016, the defendant, through counsel, filed a timely Notice of Appeal from the Judgment of Sentence, made final by the denial of the post-sentence motions. Defendant timely complied with our Rule 1925(b) order directing the filing of a concise Statement of error complained of on appeal.

Over the course of the five day trial beginning May 23, 2016 and ending May 27, 2016, the Commonwealth presented evidence from multiple sources: various members of law enforcement who investigated or prosecuted the crime; a forensic pathologist (Supriya Kuruvilla, M.D.); assistant chief deputy coroner; a female (Aaliyah Fields) who broke off a "relationship" (hanging out and flirting) with the defendant and later met Darryl Jones; an inmate (William Rosario) who gave an interview to the police prosecutor regarding a conversation he overheard in the yard while he and the defendant were at Berks County Prison; the mother of Darryl Jones's three children and his partner of 11 years (Sierra Pacheco); the victim's brother (Delonte Jones) and his girlfriend (Kadijatu Conteh), who were at the July 4th party attended by the defendant and Darryl Jones;

---

[14] The tenth day fell on Sunday, July 31, 2016.

3

and the Commonwealth's key witness, co-defendant Eric Harding (aka Fat Boy, Nut), who testified at length and in detail about the events which occurred on the evening of July 4, 2013 into July 5, 2013. N.T. Trial at 471 – 544.

Harding testified about meeting the defendant in the area of North 12th Street on the afternoon of July 4, 2013 to ride four wheelers and to attend a 4th of July party at 1027 North 12th Street. *Id.* at 471, 475. The two split up while riding the four-wheelers; the defendant returned after dark and told Harding that he was going to watch fireworks. *Id.* at 474-478. Harding left the area to unload the bikes and spend time with his children. *Id.* at 478-479. At around 11:00 p.m., Harding returned to N. 12th Street with a friend, Zechariah (Zach), and parked on Robeson Street. *Id.* at 479-480. They met up with the defendant at the party. *Id.* at 481.

At around 11:20 p.m., Darryl Jones (aka "Sparks") arrived at the party. *Id.* at 483. Jones approached a group on the sidewalk and shook hands with Harding, the defendant and a third individual. Defendant and Jones engaged in friendly conversation. *Id.* at 486. Harding walked down the street to the corner of N. 12th and Robeson Streets to avoid another individual who arrived at the party. *Id.* at 487. When he reached the corner, he turned around and saw Jones, followed by the defendant, walking towards him. *Id.* at 488. Ms. Conteh also saw the defendant and Jones leave the party together. *Id.* at 427-430. Jones told Harding to "[s]tay right here. I'll be right back". *Id.* at 488. Defendant arrived, laughing, and told Harding, "I'll be right back and just be ready to go". *Id.* at

4

489, 491, 502-503. Defendant followed Jones up towards an alleyway, then they turned and entered the alleyway.

Harding did not enter the alleyway. *Id.* at p. 490 - 492. Harding did not know what Defendant was going to do in the alleyway. *Id.* at p. 502. He assumed that Defendant was going to do something to Jones in the alleyway, maybe beat him up, and leave. *Id.* at p 503. Harding started his truck, pulled up to the alleyway but couldn't see them, then began circling the block. *Id.* at 492. As he was circling for the third time, he heard three gunshots that sounded very close. *Id.* at 495-496. He braked, looked around, then started driving. As he approached an alleyway/breezeway between two houses on 12th Street, Defendant emerged, running out with a black firearm in his hand. *Id.* at 497- 499. Defendant ran in front of Harding's vehicle, which was going north on 12th Street, and then got in. *Id.* at 500. They returned to the area of the party to get Zach. Harding and Defendant got out of the vehicle. Harding saw Defendant remove his t-shirt; he was wearing a white tank top underneath. *Id.* at 501. Ms. Conteh also saw the defendant remove the t-shirt when he returned to the party. *Id.* at 433-434 Ms. Conteh saw Harding and the defendant return to the party in a burgundy pickup truck about 15 minutes after the defendant and Jones left the party; she never saw Jones return. *Id.* at 426-433. Harding, Defendant and Zach left the party a little after midnight. *Id.* at 502, 504, 507.

5

After driving to Harding's home, Defendant took a small, black Kel Tec gun out of his pocket and put it on the bathroom sink. *Id.* at 506. Harding and the defendant left Harding's home in a white van and drove to Harding's tattoo shop. Once inside, the defendant put on gloves, put rubbing alcohol into a Ziploc bag, inserted a screw into the barrel of the gun and shook it up and down, took the clip out, then started taking the gun apart. Harding observed that the remaining bullets in the clip had neon green tips. *Id.* at 509-510. Defendant placed the pieces of the gun into the Ziploc bag and shook the bag. *Id.* at 508-511. Harding and the defendant left the tattoo shop in Harding's white van. During this trip, the defendant told Harding what happened in the alleyway. He told Harding that Jones turned toward him in an aggressive manner, with his hand in his pocket. He thought Jones had a gun and convinced Jones to keep walking. Once they got in the alleyway, he shot him in the back of the head, then shot him twice more, then took off running. *Id.* at 511 - 514. As Harding and the defendant traveled down 5th Street towards Muhlenberg Township, the defendant, while still wearing gloves, removed pieces of the disassembled gun from the Ziploc bag and threw them out the widow of the car as the car was moving. *Id.* at 513-514. The pair then went to the West Reading Diner to get something to eat. *Id.* at 515.

Darryl Jones's body was discovered in the alleyway at approximately 4 a.m. on July 5, 2013 by Officer Sholedice. *Id.* at 126-127. Officer Sholedice was responding to a possible burglary or criminal mischief call in the 1100 block of Birch Street. *Id.* at 126. He walked through the caller's yard, then into the alleyway between the 1100 blocks of N. 12th and

6

Birch Streets. He illuminated the alleyway in both directions with his flashlight; when he turned to the right, he saw the body of a male. *Id.* at 127. Officer Sholedice called dispatch to report the body. *Id.* at 127. When additional officers arrived, and the scene was taped off, he began looking for evidence. Further north in the alley, he discovered an open wallet with a PA ID card. *Id.* at 131-132. Officer Hawley, then a Reading P.D. officer assigned to criminal investigations unit as a major evidence technician, was called. *Id.* at 138-141. He collected evidence from the murder scene, including the wallet with a PA Identification card for the defendant, along with other cards (SS, student ID, Metro Bank card) with the defendant's name. *Id.* at 149.[15]

An autopsy was performed on the body of Darryl Jones by Dr. Supriya Kuruvilla, a forensic pathologist and Chief of Autopsy and Forensic Services at Reading Hospital. Dr. Kuruvilla identified three gunshot wounds on the body and removed bullet fragments including pieces with green material. *Id.* at 186 – 209. In her opinion, the cause of death was multiple gunshot wounds, with the gunshot to the back of the victim's head as a fatal injury; the manner of death was homicide. *Id.* at. 207-208.

The defense presented two witnesses: the mother of one of the defendant's children (Shyann Donaldson); and a former friend of Harding (Damian Hicks). The defendant did not testify at the trial.

---

[15] Law enforcement on the scene initially assumed the defendant was the victim based upon the contents of the wallet and identification card found near the victim's body. *Id.* at 255-257.

7

## II. ISSUES PRESENTED ON APPEAL

In his concise Statement, Defendant raises 9 claims of error and seeks appellate review of the issues presented therein, which are set forth below, *verbatim*:

1. The trial court erred in denying Defendant's Pretrial Motion for Discovery, which requested that the Commonwealth provide all recorded telephone calls made by Eric Harding while incarcerated at the Lancaster County Prison because the records custodian for those records refused to honor a defense subpoena for those records and the Court did not order the Commonwealth to obtain those records and turn them over in discovery even though the Commonwealth obtained and provided the defense with all recorded telephone calls made by Eric Harding while incarcerated at the Berks County Prison.

2. The trial court erred when it permitted the Commonwealth to introduce recorded telephone calls made by Defendant while he was incarcerated in Berks County Jail because the content of the phone calls and the trial testimony of the co-defendant about his interpretation of the meaning of those calls was unfairly prejudicial and denied Defendant a fair trial as they referred to prior bad acts and "gangs".

3. The trial court erred when it permitted the Commonwealth to introduce a surveillance video from the West Reading Diner that allegedly depicted Defendant and co-Defendant, Eric Harding because it was not relevant and was too remote in time to the alleged crimes, which was unfairly prejudicial and denied Defendant a fair trial.

4. The trial court erred when it permitted the Commonwealth to introduce a recorded DVD interview of Commonwealth witness William Rosario because he testified he had no recollection of the content of his earlier interview because it was unfairly prejudicial, denied Defendant his right to confront the witness, and denied Defendant a fair trial.

5. The trial court erred when it refused to allow defense counsel to fully cross-examine Eric Harding, with the information attached to the trial transcript as Defense Exhibit 4, about his involvement as a participant/witness in a murder case in NJ, which denied Defendant his right to confront the witness and denied Defendant a fair trial.

6. The trial court erred in failing to grant Defendant a new trial because juror number 12 was a juror on the case and had an undisclosed, close familial relationship with the victim, Darryl Jones Jr. and was unable to be fair and impartial as a juror thus denying Defendant due process and a fair

8

trial as required by Article I, §9 of the Pennsylvania Constitution and the 6th Amendment to the United States Constitution.

7.    The trial court erred in failing to grant Defendant a judgment of acquittal or an arrest of judgment on all charges because the verdicts of the jury were against the weight of the credible evidence presented at the trial for all the reasons set forth in the Defendant's Post Sentence Motions.

8.    The trial court erred in failing to grant Defendant a new trial based upon the newly discovered evidence of the testimony of John Rushton, which could not have been discovered prior to trial through the exercise of due diligence, was not merely corroborative or cumulative, would not be used solely to impeach a witness' credibility and would likely result in a different verdict had that testimony been presented to the jury at trial.

9.    The evidence presented at trial was insufficient to support the verdicts of the jury on all counts because the evidence presented fails to identify Defendant as a participant in any of the crimes.

We address each of the issues in the order in which they appear.

III.   DISCUSSION

A. Discovery of Telephone Calls by Co-Defendant from Lancaster County Prison.

In his first claim of error, Defendant challenges the trial court's refusal to require the Commonwealth to "provide all recorded telephone calls made by co-defendant Eric Harding while incarcerated at Lancaster County Prison". On June 19, 2015, Defendant filed a formal pretrial Motion for Discovery in which he sought, *inter alia*, production of "recorded telephone calls from Harding made subsequent to being relocated out of BCP to Lancaster County Prison". Motion for Discovery at ¶9. In support of this request, Defendant argued that this and other requested discovery is relevant, may be exculpatory evidence material to his guilt or innocence under *Brady v. Maryland*, 373 U.S. 83 (1963), and that impeachment evidence must be disclosed under *Brady*. Motion for Discovery at ¶ 10, 11.

9

This discovery request falls within the discretion of the court. Under Pa.R.Crim.P. 573(B)(2)(a), the court *may*, upon defendant's filing of a motion for pretrial discovery, allow the defendant to inspect, copy or photograph certain items not mandated to be disclosed by the Commonwealth upon request under subsection (B)(1) "upon a showing that they are material to the preparation of the defense, and that the request is reasonable". On September 1, 2015, the trial court[16] held a hearing on the June 19, 2015 discovery motion; thereafter, the parties submitted briefs in support of their respective positions.

On December 18, 2015, President Judge Yatron issued an order denying Defendant's motion for discovery, along with an opinion in disposition of the motion. The court concluded that Defendant failed to carry his burden under Rule 573 that the requests were reasonable and that the requested items were material to his defense. With respect to the Lancaster County Prison phone calls, the court concluded that Defendant's argument was "entirely speculative"; the court could not "conclude that there is a reasonable probability that the requested discovery would lead to evidence that would exonerate Defendant". Opinion of 12/18/2015 at p. 3.

---

[16] This case was originally assigned to The Honorable Paul Yatron, President Judge, who addressed this discovery motion and certain other pretrial issues. By order dated March 17, 2016, Judge Yatron recused himself. On March 23, 2016, the case was reassigned to the undersigned, Judge Patrick T. Barrett, who addressed subsequent pretrial motions *in limine*, and presided over the jury trial, sentencing and post-sentence motions.

Of the 584 Lancaster County Prison calls logged at the time of the discovery hearing, 557 were calls to Harding's wife. N.T. 09/01/2015 at 15. The remaining 27 calls were to 8 separate numbers, none of which were recognized by the Commonwealth or counsel for Harding. *Id.* at 18. Additionally, counsel for Harding expressed concern over disclosing calls to Harding's spouse, given his status as a cooperating witness and the safety of Harding's family. Ultimately, after considering the information and concerns provided by counsel as to the calls, and review of the parties' briefs, Judge Yatron denied the request. We have reviewed the transcript of the hearing on the motion before Judge Yatron as well as the briefs submitted by the parties at the time of the motion. We wholeheartedly agree with the conclusion reached by Judge Yatron, namely, that the probability that the calls would yield exonerating or impeachment evidence was purely speculative. Defendant articulated no specific reasons to support his request that the calls would provide such evidence. Thus, the trial court committed no abuse of discretion in refusing to order the Commonwealth to produce the co-defendant's Lancaster County Prison phone calls. This first claim of error is therefore without merit.

B. Co-defendant's testimony about content and interpretation of recorded phone calls made by Defendant while at Berks County Prison.

In his second claim of error, Defendant asserts that the introduction of recorded phone calls made by the defendant while he was incarcerated at Berks County Prison was unfairly prejudicial because the calls referred to prior bad acts and gangs. This court reviewed the processed (extracted portions) phone calls at a pretrial hearing on May 17,

11

2016, and ruled that they were admissible. Portions of a recorded phone conversation between the defendant and Harding on July 30, 2013 and a recorded phone conversation between the defendant and Melvin Parker, who was speaking to Harding on another line, were introduced during the testimony of co-defendant Harding. N.T. Trial at 532-540; Commonwealth's Exhibit 85. The July 29th or 30th, 2013 conversation occurred while the defendant was in custody at Berks County Prison and Harding was not yet in custody. Defendant called a mutual friend, Melvin Parker, while Harding and Parker were in a car together and Parker gave the phone to Harding. *Id.* at 532-533. During trial, Harding was permitted to testify to the meaning of certain phrases used by the defendant in their conversation on July 30, 2013, such as "stay out the way" (meaning "stay, like, out of the city and just out of the mix, like not in anything that's going on"), or in response to Harding's statement that he was being "pressed" by Detective Snell to "stick to protocol" (meaning "not to say nothing"), or references to the "land line situation" (meaning the calls are recorded), or "play by play" (meaning Defendant would keep Harding apprised of what was going on). *Id.* at 534-538.

By August 1, 2013, Harding, too, was in custody. *Id.* at 529. He called Melvin Parker from Central Booking or Berks County Prison. *Id.* at 533. Parker was on the phone with the defendant. Parker relayed Harding's statement that "they can't break us" to the defendant, referring to Harding's conversation with Detective Snell and sticking to the story that Harding and the defendant concocted while in New Jersey. (The two traveled

12

to New Jersey when they "figured that they had [the defendant's] wallet already so we needed to come up with a story to cover his butt."). *Id.* at 539.

Given the nature of the charges, including the conspiracy charges, filed against the defendant, Harding's interpretation of the meaning of phrases used in their recorded conversations was helpful in assisting the jury to evaluate those charges. Considering the content and context of the conversations, this court finds those phrases were not particularly susceptible of multiple interpretations such that Harding's explanation or interpretation of the defendant's words would confuse or mislead the jury. Though a written transcript of the calls was not introduced into the record, this court recalls the defendant's reference to gang activities was in the nature of a play on words. The record contains no evidence that the victim's murder was gang-related. The court committed no abuse of discretion in allowing the introduction of the recorded conversations. Further, we find no renewed or contemporaneous objection by the defendant at the time of their admission into the record.

### C. Surveillance Video From West Reading Diner

In his third claim of error, Defendant asserts that the video of the defendant and co-defendant Harding at the West Reading Diner was irrelevant, too remote in time and unduly prejudicial. The court reviewed this video prior to trial as part of a defense pretrial motion *in limine* seeking its exclusion and permitted it to be played at trial. N.T.

13

Trial at 517-519 (Commonwealth's Exhibits 62, 63, 64, 65); Order of May 20, 2016. We find this claim to be without merit. The surveillance video depicts the arrival of the defendant and Harding at the Diner at approximately 2:46 a.m. on July 5, 2013. It corroborated the details of a sequence of events which occurred in the hours following the shooting of Darryl Jones to which Harding testified. Kadijatu Conteh testified that after the defendant left the party on 12th Street on foot with Harding and the victim at approximately 11:00 p.m., he returned to the party in Harding's burgundy pickup truck, got out of the passenger's side of the vehicle, removed a white sleeved T-shirt which revealed a white tank top underneath, then left the party with Harding and a third individual, Zechariah (Zach). *Id.* at 433-434. The defendant was wearing a similar tank top in the surveillance video at the Diner. *Id.* at 517. The witness's testimony regarding Defendant's clothing change after the shooting corroborates Harding's account of the events occurring in the few hours following the shooting of Darryl Jones. This evidence is neither unduly prejudicial nor irrelevant. Nor do we find it too remote in time, the event having occurred just a few hours after the time of the shooting and during a sequence of events following the shooting. Moreover, we cannot locate an instance in the record where Defendant renewed his objection to the introduction of the surveillance video during the trial. The video was properly admitted under Pa.R.E. 401 and the court committed no abuse of discretion in so ruling. Therefore, this claim of error is without merit.

14

### D. Recorded DVD Interview of Commonwealth's Witness, William Rosario

In his fourth claim of error, Defendant asserts that this court erred when it permitted the Commonwealth to introduce a recorded DVD interview of its witness, William Rosario, when the witness testified that he had no recollection of the content of his earlier interview, because it was unfairly prejudicial, denied Defendant his right to confront the witness, and denied Defendant a fair trial. William Rosario was incarcerated in Berks County Prison in August through November 2013. N.T. Trial at 312. Rosario and/or his attorney reached out to the District Attorney's Office about information he acquired in prison regarding the death of Darryl Jones. In November 2013, Rosario gave a recorded interview to the Reading Police Department at City Hall. *Id.* at 314, 334. The Commonwealth called Rosario at trial, at which time he testified that he gave a statement at City Hall regarding Darryl Jones's death; that the information was fresh in his memory when he gave the statement; that he was trying to be truthful when he gave it; that he told the police he was giving a truthful statement; and that he no longer remembered the contents of the statement. *Id.* at 313-315, 334. Rosario requested – and received -- favorable treatment on a pending persons not to possess a gun charge in exchange for his statement. *Id.* at 315-317; 341-343. Rosario did not want to -- or believe that he needed to -- appear at the trial, having already completed his plea deal. *Id.* at 348 - 349.

The Commonwealth sought to introduce the recorded interview, and the defense objected. *Id.* at 317, 332. This court overruled the objection, and the recorded DVD

15

interview was played. *Id.* at 333, 335-338; Commonwealth's Exhibit 87. The interview

contained Rosario's statement that he heard the defendant say in the exercise yard that

he killed Darryl Jones, and that Jones had a "dead man's look". Pennsylvania Rule of

Evidence 803.1(3) provides a hearsay exception under the following circumstances:

> The following statements are not excluded by the rule against hearsay if the declarant testifies and is subject to cross-examination about the prior statement:
>
> . . .
>
> (3) Recorded Recollection of Declarant-Witness. A memorandum or record made or adopted by a declarant-witness that:
> (A) is on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately;
> (B) was made or adopted by the declarant-witness when the matter was fresh in his or her memory; and
> (C) the declarant-witness testifies accurately reflects his or her knowledge at the time when made.
> If admitted, the memorandum or record may be read into evidence and received as an exhibit, but may be shown to the jury only in exceptional circumstances or when offered by an adverse party.

Upon review of the trial transcript, we find that the Commonwealth provided the

appropriate foundation under 803.1(3) for the admission of the DVD recording of the

interview. The Court committed no abuse of discretion in permitting its admission.

Therefore, this claim of error must fail.


> E. Cross-Examination of Eric Harding About His Involvement as Participant/Witness in NJ Murder Case


During cross-examination of co-defendant Eric Harding, the Commonwealth objected

on relevancy grounds when defense counsel asked Harding about a 90 day sentence

imposed by Judge Keller beginning August 1, 2013 -- the date on which the second

16

recorded phone conversation occurred. N.T. Trial at 549-550. Defense counsel argued that the Commonwealth opened the door to this line of questioning when it played the recorded phone conversations on direct examination of Harding, because neither the defendant nor Harding had been charged in this case at the time. Harding, it turns out, was sentenced to 90 days' incarceration for contempt of court when he failed to appear at a hearing in Berks County on a rule to show cause why he should not be compelled to testify as a witness in a New Jersey criminal case involving his brothers. He was served with the subpoena to testify in New Jersey *via* a Berks County District Attorney's Office detective under a miscellaneous docket. *Id.* at p. 553. Counsel sought to "elicit from Harding that he was subpoenaed to appear as a witness in a case in New Jersey for which he had given a statement to the police; that he knew what the trial date was but failed to appear, and was compelled by our courthouse because Harding didn't appear" and that he rather than appearing for the trial, did not appear, got held in contempt by Judge Keller. Ultimately, the case was dismissed against both brothers." *Id.* at 562, 563.

Defense counsel argued that "staying out of the way" as discussed in the recorded Berks County Prison phone conversations could have an alternate explanation, namely, avoiding authorities to deliver Harding in time to testify in the New Jersey murder case. This court permitted defense counsel to cross-examine Harding as to the 90 day sentence because he failed to appear to testify at a trial in New Jersey when he was under subpoena to do so, and that he failed to comply with the subpoena. *Id.* at 571.

17

However, we concluded that questioning Harding about a murder case in New Jersey, in which his brothers were defendants, where the charges were dismissed due to Harding's failure to appear, would confuse the jury and lead to litigating that case within the instant trial. *Id.* at 575.

Defendant was free to cross-examine Harding about the alternate explanation for "staying out of the way" – avoiding a subpoena to testify on July 30, 2013 in a New Jersey case, without mentioning that it was a murder case or that his brothers were defendants. In fact, defense counsel did cross-examine Harding on that issue, and Harding acknowledged that he told C.I. Snell in March 2015 that he did have something going on in New Jersey, that a detective was trying to serve him and that he didn't want to come back. In other words, he was staying out of the way or laying low. *Id.* at 609-613. The court committed no abuse of discretion in so limiting this line of cross-examination. To insert a murder case in New Jersey, the fact that Harding's brothers were defendants in the case, and that Harding may have been a material witness for the state in that case, would needlessly divert the jury's attention from the case at hand without adding anything to the facts involving Darryl Jones's murder. Moreover, there was no evidence that the defendant was involved in the New Jersey case. The court permitted the defense sufficient latitude to examine Harding on this issue. It was for the jury to determine whether Harding was laying low because of the New Jersey case, the instant case, or perhaps both.

18

### F. Juror Number 12

In his sixth claim of error, Defendant asserts that a new trial should be granted because Juror No. 12 (Panelist No. 35), "had an undisclosed, close familial relationship with the victim, Darryl Jones, Jr. and was unable to be fair and impartial as a juror". For the following reasons, we find that the issue was waived. Moreover, had the issue not been waived, the trial court committed no abuse of discretion in permitting Juror No. 12 to serve.

Pa.R.A.P. 302(a) sets forth the general rule regarding requisites for a reviewable issue: "[I]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal". Describing issue preservation as "foundational [to] proper appellate review", the Pennsylvania Supreme Court has noted that requiring an issue to be raised at the trial court safeguards the trials court's ability to both consider an issue and correct any error at the earliest opportunity. *In re F.C., III*, 607 Pa. 45, 64, 2 A.3d 1201, 1211-1212 (2010) (citations omitted). *See also, Commonwealth v. Rosser*, 135 A.3d 1077, 1086 (Pa. Super. 2016). The issue preservation requirement "advances the orderly and efficient use of our judicial resources" and "concepts of fairness and expense to the parties are implicated as well." *F.C.*, 2 A.3d at 1211-1212 (citation omitted).

During *voir dire* of the jury panel by the Commonwealth, the following exchange occurred:

19

> Mr. Boyer: The victim in this case, his name is Darryl Jones, Jr. Does anybody know or knew Darryl Jones, Jr. or anybody know his family currently? If so, please rise.
>
> . . .
>
> Mr. Boyer: And, yes, sir, No. 35?
> Prospective Juror: Yes. Darryl Jones, Sr. is my son-in-law.
> Mr. Boyer: Have you spoken to Darryl Jones, Sr. about the case?
> Prospective Juror: No, I haven't.
> Mr. Boyer: Okay. Could you put that relationship aside and judge the case solely on the evidence presented during the course of this trial and apply the facts or apply the law to the facts as you find them?
> Prospective Juror: Yes.
> Mr. Boyer: Okay. Thank you. You may have a seat.

N.T. Trial at 44-46. In a subsequent *in camera* conference to review challenges for cause, the following exchange occurred among the Commonwealth, defense counsel and the Court:

> Mr. Dautrich: No. 35 is the Darryl Jones, Sr. is his son-in-law. Did say he could be fair and impartial, but this is his, I guess, son-in-law's son is the victim of this case.
> Mr. Mc Naughton: I have that he never spoke to him about the case and he thought he could be fair and impartial.
> Mr. Dautrich: All right. I did see did not speak to the father, Darryl Jones, Sr. about the case. So I guess that - - -
> The Court: I remember him saying he could be impartial.

*Id.* at 70.

Neither the Commonwealth nor the defense requested that Prospective Juror No. 35 be stricken for cause at that time. The panel of prospective jurors numbered 77. *Id.* at 71. Of that number, 22 jurors were stricken for cause. *Id.* at 79. The parties each received 7 peremptory strikes in this non-capital case. *See* Pa.R.Crim.P. 634(A)(2); N.T. Trial at 79. Of the original panel of 77, after 22 prospective jurors were stricken for cause and the

20

parties exercised peremptory challenges of 9 each, including peremptory challenges for the 4 alternates, 12 principal jurors and 4 alternates were selected. Prospective Juror No. 35 was selected as principal juror No. 12. *Id.* at 88-89. Following opening statements by counsel, the Commonwealth proceeded with its case.

After the lunch break on the second day of trial, juror No. 8 was excused from serving after it was learned that he lived outside Berks County. He was replaced with Alternate Juror No. 1. *Id.* at 260, 272, 275-276. Then, the following exchange occurred *in camera* regarding Juror No. 12:

> Mr. Boyer: Can we talk about Juror No.12?
> The Court: Okay.
> Mr. Boyer: Juror No. 12, during *voir dire*, said that he may be the victim's father -- Darryl Jones, Sr. may be his son-in-law. I did some checking on that and yes, the victim's father is certainly Darryl Jones, Sr., who has --and who is either married to or had a long relationship with a person by the name of Camille Flowers (phonetic), I don't know if they're married or not. Camille Flowers is not the victim's mother. Camille Flowers has a mother who is either married to or has a long relationship with Juror No. 12. They tell me that none of the immediate family members have ever discussed this case with Juror No. 12, and they only see him on rare occasions, once or twice a year. They have never -- they haven't seen him in the recent past and they have never spoken to him about this case.
> The definition on here, it's 4503 of Title 42, No. A4, says spouses, children, siblings, parents and grandparents, and grandchildren of victims of criminal homicide shall be exempt and excused from jury duty. I'm not sure if Juror No. 12 qualifies as a grandparent. Certainly he's not grandparent by blood. I don't think that there's an issue. Certainly Juror No. 12 said he would be fair and impartial and he was honest about his relationship with the victim. And I don't think he qualifies as a grandparent under the rule, but I did want to put it on the record because the victim's family did approach me over break and did tell me that they recognized him. And they were concerned about him being on the jury, whether he was qualified under the rules.
> The Court: All right. So you're not making a motion to have Juror No. 12 excused, correct?

21

Mr. Boyer: No, I am not.

The Court: If tonight you or someone in your office does some research and somehow he would fall under that definition, we can revisit the issue. We're still going to have three alternates left.

Mr. Dautrich: At this point.

The Court: All right. Is there anything else?

*Id.* at 273-274. The issue of Juror No. 12 serving on the jury did not arise again during the course of the trial.

We find that the defendant has waived the issue of whether Juror No. 12 ought to have been excused from serving. Defendant had multiple opportunities to raise the issue, beginning with jury selection, on the afternoon of the second day of trial when it was raised again by the Commonwealth, or prior to conclusion of trial. He failed to do so. There is no evidence that either Juror No. 12 or the Commonwealth deliberately deceived or misled the defense in any way. Defendant was present in the courtroom when *voir dire* was conducted and during the passing of the book, though he claims that he does not recall hearing Juror No. 12 state that victim's father was his son-in-law. N.T. post-sentence motion hearing 10/18/2016 at 55, 56-57. Defendant also had a recorded conversation from Berks County Prison with a third party, on or around August 9, 2016, in which he discussed talking to his attorney about keeping or striking Juror No. 12 from the jury. N.T. 10/18/2016 at p. 62-63. Neither side expressed any desire to delve further into the nature of Juror No. 12's relationship with the victim or his family; they were apparently satisfied with his explanation that he never discussed the case with his "son-in-law" and that he could be fair and impartial. We can only conclude that the

22

defendant's failure to challenge or strike Juror No. 12 was part of an overall trial strategy (please note that both the Defendant in the above-captioned action as well as the Juror in question are African-American). This court is unwilling to impose its views as to what an appropriate trial strategy might be for either party, and especially so when neither side sought removal of the juror during trial. The various and considerable costs associated with the trial, both monetary and nonmonetary, to the Court system, the litigants and family members of both the victim and the defendant, cannot be ignored or minimized. As the record reflects, three alternate jurors remained in the event either party sought to have Juror No. 12 excused.

The testimony offered at the evidentiary hearing on the defendant's post-sentence motion provides no additional depth or new dimension on this issue. Defendant presented a witness, Michael Hardison, who was incarcerated at Berks County Prison with the defendant following the trial. While they were in the restricted housing unit at Berks County Prison following the trial, Hardison told the defendant that he encountered an individual by the street name of "Bam Bam" (actual name unknown) who was on his way to court during the trial. Bam Bam is "another guy that's married to the [victim's] family". Bam Bam told Hardison that the grandfather of the victim was on the jury. N.T. 10/18/2016 at 49. The information about a connection between Juror No. 12 and the victim's father was clearly not new. Bam Bam never told the witness that Juror No. 12 had contact with the witness. N.T. 10/18/2016 at 51. There is no credible

23

evidence that Juror 12 had contact with the victim or that he discussed the case with members of the victim's family.

At the post-sentence motion hearing, the defendant raised for the first time the issue of exhaustion of peremptory challenges which prevented him from striking Juror No. 12. N.T. 10/18/2016 at 78-80. This court then reviewed the usual procedure which counsel followed in exercising peremptory challenges in this case: the Commonwealth reviewed 2 to 3 prospective jurors at a time, in numerical order, beginning with Prospective Juror 1 and skipping those stricken for cause, then passed the juror book to defense counsel to review the same 2-3 individuals. N.T. 10/18/2016 at 65-69. Defense counsel's "recollection is I executed my peremptory challenges at that point the ones the 7 that pertained to the jurors that would comprise the 12 primary jurors of this trial". N.T. 10/18/2016 at 79. However, if that were the case -- counsel could not provide definitive proof of that and the numbers suggest otherwise -- the appropriate time to raise that issue was during jury selection. Thus, the issue is waived.

Further, this court would note that of the 34 jurors prior to the juror in question, 10 were stricken for cause. Therefore, the Juror in question actually became the 25th sequential juror when counsel began passing the book having all their peremptory challenges available.

At this point, all that can be said is that Juror No. 12 revealed a nexus to the victim's father at the appropriate time during *voir dire*. Whether he correctly labeled the

relationship/nexus is unclear.[17] Neither side chose to further examine Juror No. 12 on the nexus. Given what each of the attorneys knew about Juror No. 12 -- and when they knew it -- their decision to forego two obvious opportunities (when addressing cause challenges at *voir dire* and again on day 2 of trial when another Juror was questioned and removed) to examine Juror No. 12 constitutes waiver. In addition, Defense counsel could have saved a peremptory challenge to remove Juror No. 12. Defendant cannot have it both ways by waiting for the outcome of a particular strategy then claiming prejudice when a different outcome was reached.

Were we required to address the issue, however, we conclude that the court committed no abuse of discretion in seating Juror No. 12. The court committed no abuse of discretion in permitting a juror with a current or past relationship to a woman whose daughter had a relationship with the father of the victim to be seated, where neither the Commonwealth nor the defense sought to strike the juror for cause or to exercise a peremptory challenge to remove the juror, and the juror answered that he could be fair and impartial.

---

[17] The evidentiary hearing on the Defendant's post-sentence motions and motion for discovery to compel the Commonwealth to provide defense counsel with the "specifics of the conversation ADA Boyer referenced, including names of all people present, who said what, and all contact information for the participants in the conversation", Motion for Discovery at ¶7, was held on October 18, 2016. Following the hearing, the Commonwealth provided a written, verified response to Defendant's discovery motion providing the correct last name (Taylor-Jones) of the woman previously identified on Day 2 of trial as "Camille Flowers". Camille Flowers was not the mother of the victim. This information does not add any different information about the exact nature of the relationship between the various individuals, and merely reinforces our conclusion that the issue was not raised nor explored by defendant when the opportunities presented themselves and is therefore waived.

25

### G. Weight of Evidence

In the seventh issue, Defendant argues that the guilty verdicts were against the weight of the *credible* evidence. Instead of listing the reasons in the concise statement, Defendant refers the court back to "all the reasons" as to why the verdicts were against the weight of evidence listed in his post-sentence motion for new trial. We will not repeat each of those 7 reasons at length here. Instead, we will simply address our reasons for rejecting them.

In *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745 (2000), the Pennsylvania Supreme Court set forth the applicable standard when evaluating challenges to the weight of evidence:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. *Commonwealth v. Whiteman*, 336 Pa.Super. 120, 485 A.2d 459 (1984). Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. *Tibbs*, 457 U.S. at 38 n. 11, 102 S.Ct. 2211. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Brown*, 538 Pa. 410, 648 A.2d 1177 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Thompson, supra.*[18] A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.*

---

[18] *Thompson v. City of Philadelphia*, 507 Pa. 592, 493 A.2d 669 (1985).

744 A.2d at 751-752. "A verdict is against the weight of the evidence 'only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice.'" *Commonwealth v. Blakeney*, 596 Pa. 510, 522, 946 A.2d 645, 652 (2008), quoting *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1036 (2007). Assessing the credibility of witnesses is within the sole province of the jury. *Blakeney*, 946 A. 2d at 653. At the outset, we note that Defendant argues that the verdict was against the weight of the *credible* evidence. As the foregoing summary of the law on this issue makes clear, it is not this court's role to sit as finder of fact and conduct its own assessment of witness credibility. The jury chose to believe the testimony of co-defendant Eric Harding even though defense counsel aggressively cross-examined Harding and made it abundantly clear that Harding had something to gain by agreeing to testify for the Commonwealth as its key witness.

The jury also rejected the idea that Harding fabricated testimony by adding "additional details into his testimony at trial that he did not tell the police before, such as he and Nelson returned to the scene of the shooting after eating at the West Reading Diner and saw the police on scene using lighting that he described as stadium lighting". The trial transcript contains Harding's testimony that he dropped defendant off at defendant's sister's house on Washington Street, then picked up a female friend who accompanied him to Walmart. Harding dropped off the female friend after the Walmart trip, then picked up defendant and returned to Walmart to purchase items for defendant. After

27

leaving Walmart, defendant stated that he needed to find his wallet. He wanted to return to 12th Street to look for it. When they approached 12th Street and drove down Robeson, they saw big lights in the alleyway into which defendant and Darryl Jones walked a few hours earlier. Defendant said he wasn't going to stop to look for his wallet. They left the area. N.T. Trial at 519-523. Defense counsel cross-examined Harding about whether he added details in his testimony that were not included in his original statement to Detective Snell, whether his memory was better at the time of the original statement or at time of trial, *etc.*, and whether his testimony was "scripted" or rehearsed as to content prior to providing a statement or testifying. *Id.* at 591-597. The jury accepted Harding's answers and found him credible.

With respect to the defendant's claims that other civilian witnesses contradicted Harding's testimony, there was no evidence of a "beef" between defendant and Darryl Jones other than that offered by Harding, Damian Hicks testified that Harding disposed of a gun, Defendant lost his wallet prior to 10:00 p.m., and that no artificial lighting was used at the crime scene, we again defer to the jury as finder of fact. It is also within the province of the jury to determine the facts of the case, whether the evidence was in conflict, and if so, whether any conflict could be reconciled, or which conflicting evidence was the more credible. The jury was properly instructed in this regard. *Id.* at 916-917. We also properly instructed the jury that motive is not an element of the crime. *Id.* at 918. Finally, claims that the police investigation of Darryl Jones' murder was deficient in certain respects was an issue for the trier of fact. Defense counsel cross-

28

examined police witnesses involved in the investigation. The jury's verdicts indicate that they were satisfied with police accounts of the investigation.

We find nothing on the record to suggest that the jury ignored certain facts or accorded them equal weight such that justice was denied. Considering the record as a whole, we do not find the jury's verdicts of guilty on all counts shock one's sense of justice or that a miscarriage of justice prevailed. The verdicts were not against the weight of the evidence.

### H. After-Discovered Evidence by John Rushton

In his eighth claim of error, defendant asserts that the trial court erred in failing to grant his motion for a new trial due to after(newly)-acquired evidence in the form of testimony from John Rushton. Rushton testified at the post-sentence motion evidentiary hearing held on October 18, 2016 as follows. He became associated with co-defendant Eric Harding in 2009, when he bought crack cocaine from Harding. Rushton eventually became close to Harding; he ran errands for Harding and cared for Harding's children, lived with Harding on and off when he had no place else to stay, and spent considerable periods of time with Harding. N.T. Post-sentence hearing, 10/18/2017 at 14-15. Rushton knew that Harding had handguns, including a black 9 mm Kel-Tec, a compact A.C.P. 45 and 9 mm Ruger. *Id.* at 15-16. Rushton met Defendant one or perhaps two times. *Id.* at 42. He never saw Defendant with a gun. *Id.* at 27, 41-42.

29

During the time Rushton was in close contact with Harding, Harding had "an incident in New Jersey". Rushton testified that "I guess [Harding] had some court situation that he was trying to avoid, and I went with him to different locations like a female friend of his and he stayed I think at a hotel or something like that and we were trying to avoid contact with him." Harding was not picked up by the authorities. *Id.* at 16-17.

Sometime after July 4, 2013 — in or around August -- while Rushton was incarcerated in the York County Prison, Harding paid a surprise visit[19] to Rushton. *Id.* at 17-19. Rushton recalls their conversation:

> Mr. Rushton: And I sat down and I was like, what are you doing here? And he said, remember when I had the situation with New Jersey and, you know, we had to avoid, you know, I guess it was detectives from Exeter that were looking for him for the detectives in New Jersey, he said I got another bad situation you are probably not going to see me for a long time so I'm going away so.
> Mr. Dautrich: Did you have any further conversation with him about what he meant by that?
> Mr. Rushton: Not at that point. I wasn't sure what was going on so.

*Id.* at 18.

After he was released from York County Jail, Rushton again came into contact with Harding after the latter was released from Berks County Prison. Harding contacted him *via* Instagram. They agreed to contact each other by phone, using "fake" phone numbers. Rushton, who was "caught up in heroin really bad" wanted to "know what

---

[19] Though the date of the visit may have been a surprise, Mr. Harding was on Mr. Rushton's visitor's list.

was going on with him and stuff like that". Eventually, they met in Mt. Carmel, PA in late 2015 or early 2016. Rushton knew that Harding was arrested and charged with a murder that occurred on or around July 4, 2013, and was familiar with the public details of the case through newspaper articles and other sources. He discussed the case with Harding:

> Mr. Dautrich: Now while you were at Mt. Carmel with Eric did you discuss the murder case, this case?
> Mr. Rushton: Not immediately.
> Mr. Dautrich: Okay.
> Mr. Rushton: It was bit by bit. I was curious. I was curious to know why he decided to, you know, turn evidence or anything like that because when I was living there it went against everything that he stood for, you know what I mean? It was like the street code and stuff like that. You don't tell, you know, and stuff like that.
> So I just – I was curious. I'm lying what was going on with this and basically he broke it down bluntly and said I did what I had to do to get home to my family.
> Mr. Dautrich: Did he give you any details about what his any other reasons why he may have testified in the case?
> Mr. Rushton: To come home. That's basically what he told me. He said, you know, he told me what his sentence was when he was out on bail and you know.
> Mr. Dautrich: Did he explain to you whether his whether he provided truthful information in testimony in the trial and to the District Attorney and to the police?
> Mr. Rushton: He indicated that he didn't give complete information. Like I don't even know how to explain it. Basically, he said that he said what he had to say to not implicate himself and to put the blame on somebody else.
> Mr. Dautrich: Did he make it aware to you who he put the blame on?
> Mr. Rushton: No. Because I knew. I knew what was – I saw it in the newspaper. So I'm like a lot of things were like in that situation are inferred, you know, he inferred. He did a lot of that over the years. He wouldn't come right out and say things a lot of the time. There was a lot of inferences to be drawn from what he said, you know.
> Mr. Dautrich: Did he ever tell you from the time he saw you in the York Jail, which was sometime in July or August of 2013, up to and including the time of the Mt. Carmel visit, did Eric Harding ever tell you that Johnnie Nelson had shot the guy?

31

Mr. Rushton: No.

*Id.* at 21-23.


According to Rushton, Harding was "often vague and ambiguous about him talking

about anything. So he never really flat out admits something like that, you know",

referring to whether he saw defendant pull the trigger. *Id.* at . 41. When speaking alone

with Rushton in Mt. Carmel, "different times [Harding] said different things". *Id.* at 34.


Superior Court recently summarized the procedures and applicable test for asserting

and obtaining relief based upon newly- or after-discovered evidence:

> Rule 720, relating to post-sentence procedures and appeal, provides in pertinent part:
>> (C) After-Discovered Evidence. A post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery.
>
> Pa.R.Crim.P. 720(C); *Commonwealth v. Castro*, 625 Pa. 582, 93 A.3d 818, 828 (2014) (noting that Rule 720(c) requires a motion for after-discovered evidence to be filed promptly upon the discovery of such evidence). The Note to Rule 720 states that "after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the trial judge. It is well-settled that to obtain relief, the after-discovered evidence must meet a four-prong test:
>> (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely. At an evidentiary hearing, an appellant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted.
>
> *Commonwealth v. Rivera*, 939 A.2d 355, 359 (Pa. Super. 2007) (citation omitted), *appeal denied*, 598 Pa. 774, 958 A.2d 1047 (2008).

32

*Commonwealth v. Williams,* --- A.3d ---, 2016 Pa Super 301 (2016).

Based upon the record created at the evidentiary hearing, and in light of the applicable standards set forth above, we conclude that defendant has failed to establish by a preponderance of the evidence each of the four factors required to grant a new trial based upon after-acquired evidence.

With respect to the first prong of the test, it is difficult to determine whether the asserted newly acquired evidence could have been discovered before trial through reasonable diligence. Rushton's testimony is that he waited until a few months after he met with Harding, "probably after the trial", in June or July 2016, to attempt to convey to defendant or others that he might have potentially relevant information about the case. *Id.* at 28. He waited to ensure his own guilty plea and sentence were not jeopardized and also to avoid negative repercussions and get the "okay" from a family member of the victim, Brandon Peterson. *Id.* at 38-39. In and of itself, this delay and the reasons for the delay cast serious doubt on Rushton's credibility. At some point, Rushton was able to request that defendant's attorney contact him about potentially relevant information to the case. This may have been in June or July 2016; the trial concluded on May 27, 2016. On the record before us, we are unable to determine whether, by the exercise of reasonable diligence by counsel, Rushton's information could have been obtained prior to the conclusion of trial. However, assuming, *arguendo,*

33

that counsel could not have obtained the information prior to trial through reasonable diligence, the remaining three prongs of the test must still be met.

Rushton's testimony consisted largely of innuendo and conjecture, along with contradictory or equivocal statements. After speaking with co-defendant Eric Harding in Mt. Carmel, Rushton concluded, based upon multiple inferences drawn from what Harding said or didn't say, and despite Harding's characteristically vague and ambiguous statements or cryptic references, that Harding offered false information or incomplete information or testified falsely concerning Defendant's involvement in the murder of Darryl Jones. Rushton offered that Harding "indicated that he didn't give complete information", and "said what he had to say to not implicate himself and to put the blame on somebody else." *Id.* at 22. Later, Rushton testified that Harding "made up or lied to do what he had to do to get home to his family". *Id.* at 27. Exactly what Harding lied about and when he lied about it is unclear from Rushton's testimony. *Id.* at 33-35. Rushton did not hear Harding's testimony at trial, nor did he know the contents of the statement Harding gave to police. *Id.* at 40, 42. Moreover, he apparently reached his conclusion that Harding lied prior to the actual trial, when the two met in Mount Carmel. Because Rushton's testimony would clearly be offered to discredit Harding based upon Harding's motive to fabricate to avoid implicating himself and to return to his family, it is first and foremost offered for impeachment purposes (third prong).

34

Rushton's post-trial recollection of his August 2013 conversation with Harding at the York County Prison sheds no new light on the facts surrounding the murder of Darryl Jones and would not be likely to alter the jury's verdicts. Harding's statement to the effect that he wouldn't be around for a while because of another bad situation does not establish that Harding or someone other than defendant murdered Darryl Jones. Harding's decision to go away for a long time is entirely understandable given Rushton's observation that Harding's cooperation and testimony ("turn evidence") would be "against everything that [Harding] stood for" . . . "like the street code and stuff like that. You don't tell, you know, and stuff like that." *Id.* at 22. It is not of such a nature and character that a different outcome in the jury's verdicts would be likely (fourth prong).

Harding testified on direct examination regarding his plea bargain for charges against him relating to the murder of Darryl Jones. N.T. Trial at 461-463, 542-545. Defense counsel thoroughly cross-examined Harding about the plea bargain which he received in exchange for his testimony, his preparation for testimony for the Commonwealth, and whether he was coached as to his testimony. *Id.* at 545-549, 575-581, 591-597. Harding reaped considerable benefits in exchange for his testimony for the Commonwealth. He was charged with murder of the first degree, conspiracy to commit murder of the first degree, murder of the third degree, conspiracy to commit murder of the third degree, aggravated assault, and conspiracy to commit aggravated assault arising out of the death of Darryl Jones. *Id.* at 577. He faced a maximum of 20 years'

35

incarceration for the conspiracy to commit aggravated assault charge alone. Harding pleaded guilty to that charge only on October 19, 2015. Under the plea agreement, he received time served (a little over 20 months) and three years' probation. *Id.* at 543, 578. There were still pending charges at the time of his testimony. *Id.* at 461- 462, 542. Considering the favorable treatment Harding received for his testimony, the finder of fact was free to believe or reject Harding's testimony as untruthful; the jury found him credible. Whether it was to get home to his family, to avoid the possibility of a lengthy prison sentence, or to testify truthfully in exchange for leniency, the jury understood Harding might be motivated to testify untruthfully as a means to an end; it chose to believe him. Harding, the Commonwealth's key witness, was extensively cross-examined by defense counsel, including as to the favorable treatment he received in his case in exchange for his cooperation. The jury chose to believe Harding's testimony. Rushton's proffered information would clearly be used primarily to impeach Harding's testimony. Thus, the third prong of the test has not been satisfied.

Harding's testimony at trial established that he was closely involved in the events surrounding Darryl Jones' murder. Nowhere in Rushton's proffered new information are we to find new evidence that a third party or Harding himself was the shooter. N.T. Post-sentence hearing, 10/18/2016 at 32, 33. Rushton "didn't say that [Harding] implicated himself". *Id.* at 40. Rushton testified that Harding told him that he ordered someone to pull the trigger, without mentioning a specific name. *Id.* at 34-35. Even if true, this does not make it more likely that the jury would have concluded that

36

defendant did *not* shoot Darryl Jones. It was clear from Harding's testimony at trial that Harding was involved in the crime. The jury knew that he was charged with the first and third degree murder of Darryl Jones, and conspiracy to commit those offenses. Given that he acted as the defendant's driver at the scene of the crime, and spent time with defendant after the shooting altering and disposing of the weapon, Harding's alleged statement that he ordered the murder does not make it less likely that defendant shot Darryl Jones. While he testified that Harding never told him that defendant shot Darryl Jones, Rushton offered no credible evidence to substantiate his concern that "an innocent man might spend the rest of his life in jail or a guilty man be on the streets". That Rushton did not see Defendant with a gun on the one or possibly two occasions when they met is meaningless and not likely to result in a different outcome. That Harding possessed 9 mm handguns and took a gun to his brother in Newark, NJ (which, incidentally, Harding did *not* identify as the murder weapon) does not tend to establish that someone other than defendant shot Darryl Jones nor make it more likely that such information would have resulted in a different outcome in the jury's verdict. The trial record contains more than adequate direct and circumstantial evidence -- which the jury chose to believe -- that defendant shot Darryl Jones.

Given the delay in disclosure, and the nature and tenuous character of the information offered by Rushton, we find it lacking in credibility. We further find that the nature and character of the evidence offered by Rushton would not likely have resulted in a different outcome in the case. It is both cumulative and corroborative of the evidence

37

presented at trial: Harding was closely involved in the events surrounding the murder of Darryl Jones but did not shoot Jones, and no other individual besides Defendant was identified as the shooter or could be placed in the alley with the victim at the time of the shooting. Further, Defendant's wallet with his Pennsylvania identification and other items containing his name, were found in the alley near the body.

## I. Insufficiency of Evidence

In his final claim or error, Defendant asserts that the evidence was insufficient to support the jury's verdicts as to all counts "because the evidence presented fails to identify Defendant as a participant in any of the crimes". Reviewing the transcript of the evidence presented at trial, we are unsure what, precisely, Defendant means by this statement of error, and we do not wish to presume his intent or meaning. This is consistent with the Defendant's general motion for acquittal for judgment of acquittal on all counts following the close of the Commonwealth's case in chief. N.T. Trial at 723, which this Court denied. Defendant has not identified which elements of the offenses charged were insufficiently established. Suffice it to say that the evidence, as summarized earlier in this opinion, amply supports the jury's verdicts as to all counts, and further, that Defendant was indeed a participant in the offenses.

## III. Conclusion

For the foregoing reasons, this court respectfully requests that this appeal be DENIED and the judgment of sentence AFFIRMED.

38